

I N T H E

# Court of Appeals of Indiana



FILED

Dec 30 2025, 10:22 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

Tesla, Inc. f/k/a Tesla Motors, Inc. and Kyle Kaszuba,

*Appellants-Defendants*

v.

Annamarie Dugan Norris, as Guardian of the Estate of Christopher Dugan, an Incompetent Person,

*Appellee-Plaintiff*

---

December 30, 2025

Court of Appeals Case No.
25A-CT-198

Appeal from the Marion Superior Court

The Honorable Marianne L. Vorhees, Senior Judge

The Honorable Clayton Graham, Judge

Trial Court Cause No.
49D04-1705-CT-18411

---

## Opinion by Judge Tavitas

Judges May and Vaidik concur.

**Tavitas, Judge.**

## Case Summary

[1] Tesla, Inc. f/k/a Tesla Motors, Inc. ("Tesla"), and Kyle Kaszuba (collectively, "Defendants") appeal the jury's verdict for Anna Marie Dugan Norris ("Norris"), as guardian of the Estate of Christopher Dugan ("Dugan"), an incompetent person. Tesla's employee, Kaszuba, was involved in a vehicular crash with Dugan, who was driving a motorcycle, resulting in catastrophic injuries to Dugan. A bifurcated jury trial resulted in a fault allocation of seventy percent to Kaszuba and thirty percent to Dugan. In the second phase of the trial, the jury determined that the total damages were $60.7 million, which were reduced by thirty percent due to comparative fault, for a judgment of $42.2 million.

[2] On appeal, Tesla claims that the trial court erred by granting summary judgment to Kaszuba and Norris regarding the claim that Kaszuba was acting within the scope of his employment at the time of the crash. Additionally, Defendants appeal, claiming multiple errors in both the liability and damages phases of the trial. We affirm except with respect to the trial court's *ex parte* conversation with the jurors during deliberations of the damages phase of the trial. Regarding this *ex parte* conversation, we conclude that a presumption of error applies, and Norris has failed to rebut this presumption. This error

requires a new trial on the damages phase. Accordingly, we affirm in part, reverse in part, and remand.[1]

## Issues

Tesla independently raises one issue, which we restate as whether the trial court erred by granting summary judgment against Tesla regarding the claim that Kaszuba was acting within the scope of his employment at the time of the crash.[2] Defendants collectively raise several other issues, which we consolidate and restate as:

I. Whether the trial court abused its discretion in allowing certain testimony during the liability phase of the trial.

II. Whether the conduct of Norris' counsel during the liability phase prejudiced Defendants.

III. Whether the trial court's *ex parte* discussion with the jury during deliberations of the damages phase of the trial warrants reversal.

## Facts

Kaszuba worked as a service assistant for Tesla, and his manager was Seth Aichinger. Kaszuba generally drove his personal vehicle to and from work, but

---

[1] We held oral argument in this matter on November 10, 2025, at the University of Notre Dame Law School. We thank the Law School for its hospitality and counsel for their presentations.

[2] Kaszuba filed an Appellee's brief on this issue and joined in Tesla's Appellant's brief on the remaining issues.

he occasionally drove a Tesla service vehicle to his home with Aichinger's permission. According to Aichinger, he had an informal policy that an employee should not return a Tesla service vehicle with less than a quarter of a tank of gasoline. The Tesla service vehicles each had a company-issued gas card in the vehicle.

[5] On April 24, 2017, near the end of the work day, Kaszuba was assigned to take a company trailer to a repair shop. Kaszuba drove a 2014 white Ford F250 Tesla service truck to drop off the trailer. Due to rush hour traffic and because Kaszuba was beyond his regular work hours, Aichinger gave Kaszuba permission to drive the service truck home and return it in the morning.

**The Crash**

[6] The next morning, Kaszuba was supposed to be at Tesla's service station by 8:00 a.m. Kaszuba performed a company-required fifteen-point inspection of the service truck before starting his drive to the Tesla service center. Kaszuba noticed that the service truck only had one-eighth to one-fourth of a tank of gas. Kaszuba was driving eastbound on Rockville Road in Indianapolis, and he decided to stop at a Speedway gas station on the north side of Rockville Road.

[7] The speed limit in this area is forty-five miles per hour. This portion of Rockville Road has two lanes of traffic in each direction with a center turning lane. As traffic approaches the stop light at the intersection with High School Road, the center lane turns into a concrete curbed median with double yellow lines leading to the concrete curbed median. To make a left turn into a parking

lot next to the gas station, Kaszuba stopped in the center lane shortly before the concrete curbed median began. Dugan, who was driving a motorcycle, exited the Speedway gas station, drove westbound on the shoulder lane for several feet, accelerated up to approximately thirty to thirty-five miles per hour, and then merged into the right travel lane. At 7:28 a.m., as Kaszuba was making the left turn, he struck Dugan, resulting in a severe traumatic brain injury and partial amputation of Dugan's foot.

[8] A diagram of the crash follows:



Ex. Vol. I p. 28 (Plaintiff's Ex. JX355) (Kaszuba's vehicle is yellow; Dugan's motorcycle is green). Dugan pulling out of the gas station and the crash were partially recorded by surveillance cameras at the gas station.

**Complaint and Pre-Trial Proceedings**

[9] In May 2017, Dugan filed a complaint against Tesla and Kaszuba. Dugan alleged that Tesla was vicariously liable for Kaszuba's negligence because Kaszuba was acting within the scope of his employment. In December 2017, Norris, Dugan's mother and guardian, was substituted as the plaintiff after Dugan was found to be incompetent.

[10] In July 2019, Norris filed a motion for partial summary judgment on the issue of Tesla's vicarious liability. Kaszuba also filed a motion for summary judgment regarding Tesla's vicarious liability and argued that he was acting within the course and scope of his employment at the time of the crash. Tesla filed a response to the motions for summary judgment and filed a cross-motion for summary judgment. Tesla argued that, because Kaszuba was commuting to work, he was not acting within the course and scope of his employment.

[11] The trial court granted Norris' and Kaszuba's motions for summary judgment and denied Tesla's cross-motion for summary judgment. The trial court found that "Kaszuba was on a special errand for his employer to fill the service truck with gas before returning to the company office. Kaszuba was not merely commuting to and from work. But for the need to get gas, Kaszuba would not have turned into the Speedway lot." Appellants' App. Vol. III pp. 241-42. The trial court found "no genuine issue of material fact and that Kaszuba was in the scope and course of his employment at the time of the accident." *Id.* at 242.

[12] Significant litigation revolved around motions in limine, the admissibility of Dugan's 2004 motorcycle crash, and the ability of Dugan to testify. Ultimately, the trial court issued detailed orders on the motions in limine; found that Dugan was competent to testify; and found that Dugan's 2004 motorcycle crash was inadmissible.

**Liability Phase of the Trial**

[13] By the parties' agreement, the trial court ordered that the trial be bifurcated into liability and damages phases. The liability phase of the jury trial began on March 4, 2024. Dugan testified that he could not remember the crash but did testify regarding his customs and habits while riding a motorcycle. After Dugan's direct testimony but before cross-examination, Defendants requested a mistrial regarding Dugan's "habit evidence" and Dugan's competency. Tr. Vol. VII p. 187. The trial court denied the motion.

[14] Officer Douglas Heustis, supervisor of the Indianapolis Metropolitan Police Department Traffic Investigation Unit who was at the scene of the crash, was called to testify by Norris as a skilled witness pursuant to Evidence Rule 701. Defendants repeatedly objected to Officer Heustis' testimony, which included responses to hypothetical questions, moved to strike his testimony, and requested that the trial court give a curative instruction. The trial court overruled these objections. The trial court, however, did instruct the jury that it "would be determining the facts of the case" and that it would "decide whether the facts underlying the hypothetical are true or not true. . . ." Tr. Vol. VI pp. 149-50.

Immediately before Kaszuba's testimony, during a restroom break, Norris' attorney Nicholas Rowley had a conversation with Kaszuba and apologized for Kaszuba being required to testify and blamed Elon Musk for the decision to proceed with the trial. Before Kaszuba began testifying, Defendants objected to Attorney Rowley's comments and asked that the trial court instruct Attorney Rowley not to speak with Kaszuba. The trial court granted the request, and Attorney Rowley agreed not to speak with Kaszuba again.

After closing arguments during the liability phase, Defendants requested a mistrial, *see* Tr. Vol. IX p. 126, based on Attorney Rowley's closing arguments and communication with Kaszuba, which the trial court denied. The jury found Kaszuba to be seventy percent at fault and Dugan to be thirty percent at fault. Defendants then filed another motion for a mistrial, which the trial court again denied.

**Damages Phase of the Trial**

The damages phase of the trial was then presented to the jury. During deliberations, disagreements arose between one juror and the rest of the jurors. Juror No. 1 wrote a note to the trial court indicating that he had made up his mind and was not going to change his mind. Defendants then requested a mistrial. The trial court brought Juror No. 1 into the courtroom, and the juror testified that he "made [his] decision" and "[n]obody's going to persuade [him] either . . . way." Tr. Vol. XII p. 52. The juror asked that the alternate replace him. The juror was then returned to the jury room.

[18] The trial court sent a note to the jury asking if they were unable to reach a verdict, and the jury responded that "they have reached an impasse and they are unable to render a verdict." *Id.* at 55-56. The trial court then asked the jury if there was "anything the Court or attorneys can do . . . to assist" the jury. *Id.* at 56. The presiding juror responded that Juror No. 1 was refusing to work with the jury. Over Defendants' objection, the trial court then informed the jury that the alternate juror would not be substituted for Juror No. 1 and asked if they were still at an impasse.

[19] Juror No. 6 then asked the trial court, "if communication has broken down and the environment is becoming uncomfortable, hostile, . . . what can we do?" *Id.* at 62. Defendants requested that the trial court grant a mistrial as to both phases of the trial. Juror No. 1 informed the trial court that they have "PTSD" and "[i]t's getting to me." *Id.* at 64. The presiding juror informed the trial court that they had reached an impasse. Norris requested that Juror No. 1 be replaced with the alternate juror, and Defendants again requested a mistrial as to both phases.

[20] The trial court brought the presiding juror into the courtroom, and the following discussion occurred:

> THE COURT: [ ] There's been an indication that there's some hostility and some problems with, I, I don't know, just hostility in the jury room. Is that your perception?
>
> PRESIDING JUROR: We are trying to approach the problem from many different angles to try to come to a verdict as a jury.

We have frustrations because despite our efforts to accommodate all voices and all opinions, one jury member has put his foot down and will not elaborate on to why they came to the conclusion. They will not elaborate on witness testimony that they heard or weigh and they have not participated in any form of discussion that we've tried [to] initiate.

THE COURT: So due to his behave [sic], right now, due to his position, you are at an impasse.

PRESIDING JUROR: Yes.

THE COURT: Okay. Is it a safe environment right now in the jury room? Does anybody feel threatened or coerced or pressured?

PRESIDING JUROR: No. That jury member did express that he does not want to feel like he's being backed into a corner. However, in trying to engage in any sort of conversation, he has taken that stance that he feels that he's being pushed into a corner and feels defensive.

THE COURT: By the other jurors?

PRESIDING JUROR: Correct.

THE COURT: Okay. Is there anything that you think the Court or the attorneys can do at this point other, and, and really removing him and putting the alternate in at this point, the posture that it's in, is not possible. Is there anything else that you think the Court could do or the, the attorneys could do to assist the jury in reaching a verdict?

PRESIDING JUROR: Are you allowed to give me examples or options?

THE COURT: For example, is there a point of law or a point of evidence or a fact that could be argued by the attorneys that might assist in reaching a verdict? Or is everybody pretty much, you know, under, in other words, sometimes in a case there might be, oh, I don't really understand this instruction or I don't really, I don't remember this particular piece of evidence. Can the attorneys explain it again to me? Anything like that?

PRESIDING JUROR: No.

THE COURT: Okay. And this juror number one has not, have you observed as far as his, any medical condition that's causing him difficulties?

PRESIDING JUROR: I'm aware that he has diabetes, but in checking in with juror number one, he continuously reassures the rest of the jury that he understands his limits and his current position is within those limits.

*Id.* at 65-67.

[21] After the presiding juror returned to the jury room, the trial court told the parties that it was declaring a mistrial on the damages phase and that it would allow the parties thirty days to submit briefs as to whether a mistrial on the liability phase was also required. The trial court informed the parties that it was going to go to the jury room "and tell the jury what's happened and . . . see if the presiding juror might talk" to the attorneys to assist the attorneys with the retrial. *Id.* at 70.

[22]    Upon returning from the jury room, the trial court stated:

> So when I went back in there, the jury indicated that they had
> changed their mind. That they are, and Mr. Juror Number One,
> is willing to work with them. They would like to have the
> opportunity to continue to deliberate. I said I would have to
> bring them in here and have them on the record, each of them,
> affirm that they do want to continue to deliberate, that they are
> not being coerced, they're not being pressured, and that they do
> want to continue to work on this case. So that's what I told
> them.

*Id.* at 70-71. Defendants objected that the trial court had already granted the mistrial, and the trial court stated, "Well, I can un-grant it. It's un-granted." *Id.* at 71. The trial court stated, "[L]et's find out what the jury says. They were very upset to hear that they couldn't continue. So, go ahead. I think they have a lot of investment in this case as well." *Id.*

[23]    The trial court then brought the jury into the courtroom and asked the jury:

> [Y]ou indicated to me back in the jury room when I went back
> there to see you just a couple of minutes ago that you do want to
> continue to deliberate, that you do believe that you have resolved
> the differences that you've had among yourselves, that you think
> you can make some progress. Is that correct[?]

*Id.* Each juror responded that they wanted to continue deliberating, that they were not being coerced, and that they were all "freely and in good will and good faith wanting" to continue deliberating. *Id.* at 72. The trial court then sent the jury back to the jury room to continue deliberating over Defendants' objection.

[24] Later, the jury indicated that it had reached a verdict, and Defendants objected as follows:

> Yes, Your Honor, I put on the record before we went off the record that the Court had contact with the jury outside the presence of counsel. That the result of which was immediately that the jury changed what they had declared multiple times was an impasse to continue deliberating. And that is a violation of ex-parte rules that do not [sic] prohibit a Judge to have contact with the jury during the course of deliberations outside the presence of counsel. And so, that is an additional basis on which we move for a mistrial. The immediate result of the Court's conduct with the jury which we understood the Court was having with the jury only because it already had declared a mistrial, was that the jury reversed course, and therefore it was the Court's conduct in communicating with the jury that was coercive.

*Id.* at 74. The trial court stated, "when I went in and I told the jury that I was intending to declare a mistrial, the looks on their faces was shock and amazement and they immediately said, no. That's all it was." *Id.* at 75. The trial court denied Defendants' motion for a mistrial.

[25] The jury found that Dugan's total damages were $60,687,491.00. The jury then reduced the total damages by thirty percent due to the fault allocation, for a judgment of $42,481,243.00.[3] The trial court polled the individual jurors, and

---

[3] Due to a math error in the verdict, Norris stipulated that "70 cents comes off the Plaintiff's verdict." Tr. Vol. XII p. 79.

each stated that this was their verdict and that they were not coerced or forced to reach this verdict.

## Post-Verdict Proceedings

[26] Defendants then filed a sixty-seven-page motion to correct error regarding both the liability and damages phases of the trial. After a hearing on December 9, 2024, the trial court denied Defendants' motion to correct error. The trial court found that Defendants "without a doubt" received a fair trial and that the jury's verdict "was supported by the evidence." Appellants' App. Vol. II p. 72. Regarding the damages phase deliberations, the trial court found:

> The court did not discharge the jury. The court did not enter a written mistrial order. The court polled the jury to ensure they were willing to continue to deliberate and were not under coercion or duress in doing so. The Court's interaction in the jury room did not cause any change in the jury's deliberations. They had already decided to continue to deliberate.
>
> After the jury was polled and returned to the jury room, the jury arrived at a verdict, which was 32% of what Plaintiff requested, in an uneven number ($60,687,491). This indicates they carefully considered all the evidence on damages. I find no error in how the jury deliberations were handled, and I deny the Motion as related to the jury deliberations during the damages phase.

*Id.* at 74. Defendants now appeal.

# Discussion

## I. Tesla's Vicarious Liability

[27] Tesla argues that the trial court erred by granting summary judgment to Kaszuba and Norris regarding the claim that Tesla was vicariously liable for Kaszuba's negligence. Tesla argues that it was entitled to summary judgment because Kaszuba was not operating within the scope of his employment at the time of the crash and instead he was commuting to work. Alternatively, Tesla argues that a genuine issue of material fact exists and that the vicarious liability issue should have been presented to the jury. We conclude that no genuine issues of material fact exist and that Kaszuba was acting within the scope of his employment. Accordingly, we conclude that the trial court properly granted summary judgment to Kaszuba on this issue. We emphasize, however, that our holding is narrow and fact-specific, and should not be read to expand the scope of vicarious liability beyond the unique circumstances presented by this case.

### A. Summary Judgment Standard

[28] "We review summary judgment decisions de novo, and Trial Rule 56(C) supplies the framework." *Cave Quarries, Inc. v. Warex LLC*, 240 N.E.3d 681, 684 (Ind. 2024). "The moving party is entitled to summary judgment only if the evidence it designates in support of its motion 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* at 684-85 (quoting Ind. Trial Rule 56(C)). The purpose of summary judgment is to withdraw issues from the jury when there are no genuine factual issues for the jury to decide. *Id.* at 685. "Summary judgment is

available when the nonmovant cannot prove its claim based on the undisputed evidence[.]" *Id.*

[29] The summary judgment movant has the burden of making a *prima facie* showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Burton v. Benner*, 140 N.E.3d 848, 851 (Ind. 2020). The burden then shifts to the non-moving party which must then show the existence of a genuine issue of material fact. *Id.* On appellate review, we resolve "[a]ny doubt as to any facts or inferences to be drawn therefrom . . . in favor of the non-moving party." *Id.*

[30] "We limit our review to the materials designated at the trial level." *Gunderson v. State, Ind. Dep't of Nat. Res.*, 90 N.E.3d 1171, 1175 (Ind. 2018). Because the trial court entered findings of fact and conclusions thereon, we also reiterate that findings of fact and conclusions thereon entered by the trial court aid our review, but they do not bind us. *In re Supervised Est. of Kent*, 99 N.E.3d 634, 637 (Ind. 2018).

**B. The trial court properly granted summary judgment to Kaszuba and Norris on the issue of vicarious liability.**

[31] "[Vicarious liability] is a legal fiction by which a court can hold a party legally responsible for the negligence of another, not because the party did anything wrong but rather because of the party's relationship with the wrongdoer." *Arrendale v. Am. Imaging & MRI, LLC*, 183 N.E.3d 1064, 1068 (Ind. 2022) (quoting *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 147 (Ind. 1999)).

"Respondeat superior is the doctrine most often associated with vicarious liability in the tort context." *Id.* This doctrine, in general, "relies on an employer-employee or principal-agent relationship[.]" *Id.*

> Vicarious liability will be imposed upon an employer under the doctrine of respondeat superior when an employee has inflicted harm while acting within the scope of employment. To fall within the scope of employment, the injurious act must be incidental to the conduct authorized or it must, to an appreciable extent, further the employer's business. An act is incidental to authorized conduct when it is subordinate to or pertinent to an act which the servant is employed to perform, or when it is done to an appreciable extent, to further his employer's business. Acts done on the employee's own initiative, with no intention to perform it as part of or incident to the service for which he is employed are not in the service of the employer and are thus outside the scope of employment. An employee's wrongful act may still fall within the scope of his employment if his purpose was, to an appreciable extent, to further his employer's business, even if the act was predominantly motivated by an intention to benefit the employee himself or if the employee's act originated in activities so closely associated with the employment relationship as to fall within its scope.

*Sony DADC U.S. Inc. v. Thompson*, 56 N.E.3d 1171, 1178-79 (Ind. Ct. App. 2016) (internal citations and quotations omitted), *trans. denied*. "Generally, whether the tortious act of an employee is within the scope of employment is a question of fact." *Bushong v. Williamson*, 790 N.E.2d 467, 473 (Ind. 2003). Our Supreme Court has held, however, that "under certain circumstances the question may be determined as a matter of law." *Id.*

[32] Tesla points out that our Supreme Court has held "an employee on his way to work is **normally** not in the employment of the corporation." *Biel, Inc. v. Kirsch,* 161 N.E.2d 617, 618 (Ind. 1959) (emphasis added). In *Biel*, the corporation's president drove a company vehicle and was involved in a crash on her way to work. The Court noted that she "was on no errand for the corporation" and "[h]er employment by the corporation had not yet started for the day." *Id.*

[33] This Court has referred to this general rule as the "going and coming" rule. *Dodson v. Carlson,* 14 N.E.3d 781, 783 (Ind. Ct. App. 2014), *trans. denied.* The "going and coming" rule reflects the well-established principle that the mere fact an employee is commuting to or from work does not, standing alone, bring the employee's actions within the scope of employment for purposes of vicarious liability.

> However, our Court has explained that "[t]he use of the qualifying word 'normally' [in *Biel* ] merely allows for an exception to the general rule for those instances where the employee is not just going to work, but also performing an errand for or otherwise providing some service or benefit to the company, *other than merely showing up for work*." *Dillman v. Great Dane Trailers, Inc.,* 649 N.E.2d 665, 668 (Ind. Ct. App. 1995) (emphasis in original). Thus, "[t]he critical inquiry is . . . whether the employee is in the service of the employer." *Warner Trucking, Inc. v. Carolina Cas. Ins. Co.,* 686 N.E.2d 102, 105 (Ind. 1997).

*Hudgins v. Bemish*, 64 N.E.3d 923, 931 (Ind. Ct. App. 2016).

[34]     This Court applied the *Biel* holding in *Dillman*, 649 N.E.2d 665, where an employee driving to an employee sports banquet was intoxicated, caused a crash, and killed another driver. The estate brought a wrongful death action against the employer, and the employer filed a motion for summary judgment, arguing that the employee was not acting within the scope of his employment at the time of the crash. The trial court granted the employer's motion for summary judgment. Relying on *Biel*, this Court held that the "mere fact that the accident did happen while [the employee] was on his way to work does not mean that he was therefore acting within the scope of his employment in his travel or that his employment caused the accident." *Dillman*, 649 N.E.2d at 668. The employee was "just going to work," and no designated evidence showed that he was "also performing an errand for or otherwise providing some service or benefit to the company, *other than merely showing up for work.*" *Id.* (emphasis in original). Accordingly, we concluded that the employer was entitled to summary judgment because the employee was not acting within the scope of his employment at the time of the crash. *Id.* *Dillman* illustrates that, even when an employee is traveling in connection with employment-related activities, the "going and coming" rule may still apply if the employee is not simultaneously performing a discrete service or errand for the employer's benefit.

[35]     On the other hand, in *Warner Trucking,* 686 N.E.2d 102, an intoxicated truck driver drove a company truck toward a gas station and caused a crash. The trucking company had a strict rule against its employees driving the trucks after

consuming alcoholic beverages. The trucking company, thus, argued that the employee was not authorized to drive at the time of the crash and was acting outside the scope of his employment. In contrast, the designated evidence showed that it was not "unusual for a truck driver to take a tractor to be gassed up on the day before he was going to make a run if that run was going to be early in the morning" and that the trucking company president gave the employee a cash advance that evening to pay for the fuel. *Warner Trucking*, 686 N.E.2d at 106. The Court noted that the trucking company's "vicarious liability for the acts of its driver therefore does not depend upon the driver's permission to drive, but rather upon the relationship of the driver's activities to the business" of the trucking company. *Id.* at 105. The Court thus found a "genuine issue of material fact regarding whether the employee-driver acted within the scope of his employment." *Id.* at 106.

[36] Here, the designated evidence demonstrated that Kaszuba generally drove his own vehicle to and from his employment at the Tesla service center. During his employment, Kaszuba sometimes drove the Tesla service truck, but employees were not allowed to use the service truck for personal business. The service truck had a company-issued gasoline credit card in the console, which was used by employees to fill the vehicle's tank with gasoline. Kaszuba's supervisor, Aichinger, had an informal policy that an employee should not return a Tesla service vehicle with less than a quarter tank of gasoline. This policy was not merely a suggestion or preference, but rather an expectation that employees would comply with before returning service vehicles to the employer.

[37] The day before the crash, near the end of the workday, Kaszuba was assigned to drive the service truck and drop off a trailer for repairs. When Kaszuba was finished, it was after his normal work hours, and rush hour traffic was backing up. Aichinger specifically authorized Kaszuba to take the service truck home and return it in the morning. The next morning, before driving to the service center, Kaszuba noticed that the service truck had approximately one-quarter of a tank of gasoline, and he knew that he needed to stop for gasoline before returning the service truck due to Aichinger's policy. Kaszuba decided to stop at the Speedway gas station and had the crash with Dugan as Kaszuba was turning into the gas station. Importantly, the undisputed evidence shows that Kaszuba was stopping for gas **solely** to comply with his employer's policy and **immediately before** returning the vehicle to the employer—not as part of a personal errand or detour.

[38] Unlike *Dillman*, the undisputed designated evidence here demonstrated that Kaszuba was not merely on his way to work when the crash happened. Rather, Kaszuba was authorized to and expected to put gasoline in the service truck before returning it to the service center. This case is also unlike *Warner Trucking*, where some evidence pointed to the employee acting for the benefit of his employer, but some evidence showed that the employee was breaking an employer's strict rule. Here, Kaszuba stopped at the Speedway solely to serve Tesla's business purposes. Aichinger's policy existed so that Tesla employees could assist customers quickly without the need to stop for gas. Appellant's App. Vol. II p. 175. If not for the policy requiring Kaszuba to return the service

vehicle with more than one-quarter of a tank of gasoline, Kaszuba would not have been stopping at the gas station. The undisputed facts show that Kaszuba was solely performing a service for Tesla at the time of the crash. The informal rule served the benefit of the employer, Tesla.

[39] Vicarious liability may be determined as a matter of law when the material facts are undisputed. In fact, in *Bushong*, 790 N.E.2d at 474, our Supreme Court held that the trial court properly granted summary judgment in favor of the employee regarding a scope of employment issue. There, a teacher was playing kickball with a physical education class when a student kicked the teacher. Despite warnings not to do so again, the student again attempted to kick the teacher. The teacher caught the student's "ankle in mid-air, lifted [the student] from the ground, and struck him on the back, legs, and buttocks with his hand." *Id.* at 470. Although the parents submitted a notice of tort claim against the school corporation alleging that the teacher was acting within the scope of his employment, the student's parents then filed a complaint against the teacher in his personal capacity. The trial court, however, granted summary judgment to the teacher because it concluded the teacher was acting within the scope of his employment. Given the parents' notice of tort claim against the school corporation, our Supreme Court agreed that there was no genuine issue of material fact as to whether the teacher was acting within the scope of his employment.

[40] Similarly, here, there is no genuine issue of material fact; the designated evidence shows that Kaszuba was acting solely within the scope of his

employment at the time of the crash.  The trial court found "no genuine issue of material fact and that Kaszuba was in the scope and course of his employment at the time of the accident.  Tesla is vicariously liable for Kaszuba's actions as a matter of law."  Appellants' App. Vol. III p. 242.  We agree with the trial court's determination.

[41]   Our holding, however, should not be read to suggest that an employee is acting within the scope of employment whenever the employee stops for gas while driving an employer's vehicle or whenever an employee performs some incidental task related to an employer's vehicle while commuting.  Each case must be evaluated based on its particular facts, with careful attention to whether the employee is genuinely performing a service for the employer's benefit or is simply engaged in the ordinary activity of traveling to work.  Here, the undisputed evidence establishes that Kaszuba's stop was not incidental to his commute but was instead a required task integral to returning the employer's property in the condition the employer expected and required.  Different facts—such as an employee stopping for gas for personal convenience during a normal commute in the employee's own vehicle, or an employee making a personal detour while using an employer's vehicle—could likely lead to a different result under the "going and coming" rule.

[42]   Under the specific and narrow circumstances present in this case—where an employee was complying with an employer's specifically established policy—the employee was performing a discrete service for the employer's benefit and was, therefore, acting within the scope of employment.  Accordingly, we affirm

the trial court's grant of partial summary judgment regarding Tesla's vicarious liability.[4]

## II. Admission of Testimony During the Liability Phase

[43] Next, Defendants argue that the trial court abused its discretion by admitting testimony from Dugan and Officer Heustis during the liability phase. We afford a trial court broad discretion in ruling on the admissibility of evidence. *Sims v. Pappas*, 73 N.E.3d 700, 705 (Ind. 2017). We will disturb the trial court's ruling only where the trial court has abused its discretion. *Id*. "An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it." *Id*. (quoting *Turner v. State*, 953 N.E.2d 1039, 1041 (Ind. 2011)). In addition, it is well established that "'errors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party.'" *Sibbing v. Cave*, 922 N.E.2d 594, 598 (Ind. 2010) (quoting *McClain v. State*, 675 N.E.2d 329, 331 (Ind. 1996)). "To determine whether the admission of evidence affected a party's substantial

---

[4] Tesla also argues that the trial court erred by instructing the jury regarding vicarious liability. In general, when a party challenges the giving of an instruction, we consider the following:

• Does the instruction correctly state the law?

• Is the instruction supported by evidence in the record?

• Is the instruction's substance covered by other instructions?

*Humphrey v. Tuck*, 151 N.E.3d 1203, 1207 (Ind. 2020). Tesla, however, makes no argument regarding these three factors. Instead, Tesla merely argues that the instruction influenced the verdict and permitted the jury to focus the case on Tesla and its wealth. Accordingly, this issue is waived for failure to make a cogent argument. *See* Ind. Appellate Rule 46(A)(8); *Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind. Ct. App. 2002) (holding that the failure to present a cogent argument waives the issue for appellate review), *trans. denied*.

rights, we assess the probable impact of the evidence upon the jury." *Id*. (citing *McClain*, 675 N.E.2d at 331).

### A. Dugan's Testimony

[44]    Defendants argue that the trial court abused its discretion by allowing Dugan to testify during the liability phase due to his alleged incompetency, allowing Dugan to testify regarding his habit evidence, and refusing to allow Defendants to cross-examine Dugan regarding a prior motorcycle crash. Dugan's testimony—both as to his alleged competency and the content of his testimony during the liability phase—was hotly contested and the subject of multiple hearings and motions in limine. Ultimately, however, the trial court allowed Dugan to testify during the liability phase. Dugan could not remember the crash with Kaszuba. Dugan briefly testified that he had driven motorcycles for many years, that he had a license to drive a motorcycle, that he usually drove his motorcycle to work, and that he had gotten gasoline at that Speedway before. Dugan briefly testified about his general procedures when exiting the Speedway to make a right turn. Defendants did not object during Dugan's direct testimony.

[45]    Defendants moved for a mistrial after the direct examination of Dugan and before cross examination. Defendants argued that Dugan testified to "purported habit evidence" and that Dugan was incompetent to testify. Tr. Vol. VI p. 237. The trial court denied Defendants' motion for a mistrial but stated that it would instruct the jury that "they cannot consider [Dugan's] injuries and present physical and mental condition in determining the liability

issues." *Id.* at 242. Defendants also sought to question Dugan regarding a 2004 motorcycle crash he was involved in, but the trial court found the prior crash was inadmissible. Tr. Vol. VII p. 186; *see also* Appellants' App. Vol. VII p. 157 (order granting a motion in limine regarding Dugan's driving record, including other motor vehicle or motorcycle crashes in which Dugan was involved).

[46] We first note that a trial court's ruling on a motion in limine is not a final order, and a party must also contemporaneously object to the admission of the evidence at trial to preserve the issue for appeal. *Cook v. Beeman*, 150 N.E.3d 643, 645 (Ind. Ct. App. 2020). "Regardless [of] whether a motion in limine was filed, a party has a duty to contemporaneously object to the admission of evidence a party wishes to challenge." *Id.* (citing *Walnut Creek Nursery, Inc. v. Banske*, 26 N.E.3d 648, 654 (Ind. Ct. App. 2015)). "'By making a contemporaneous objection, the party affords the trial court the opportunity to make a final ruling on the matter in the context in which the evidence is introduced.'" *Id.* at 645-46. "The failure to contemporaneously object results in waiver of the issue on appeal." *Id.* at 646. Although Defendants raised these issues in motions in limine, Defendants did not object during Dugan's direct examination in the liability phase. By failing to contemporaneously object, Defendants waived any issue regarding Dugan testifying or Dugan's habit evidence testimony during his direct examination.

[47] Only Defendants' argument regarding the admissibility of Dugan's 2004 motorcycle crash as impeachment remains. Defendants argue that Norris opened the door to this evidence by asking Dugan about his general driving

practices. On direct examination, Dugan testified regarding his experience driving a motorcycle, his license to drive a motorcycle, his knowledge regarding making a right-hand turn into traffic and using turn signals, and his knowledge of the Speedway gas station at issue here. "A party may 'open the door' to otherwise inadmissible evidence by presenting similar evidence that leaves the trier of fact with a false or misleading impression of the facts related." *Walker v. Cuppett*, 808 N.E.2d 85, 98 (Ind. Ct. App. 2004). We conclude that Norris opened the door to evidence of Dugan's prior motorcycle crash by presenting testimony that left the jury with the impression that Dugan was a knowledgeable and safe motorcycle driver.

[48] We conclude, however, that the exclusion of the evidence regarding the 2004 crash was harmless. The instant crash was partially recorded by surveillance video, a witness to the crash testified at the trial, and experts testified as to the cause of the crash. The admission of evidence regarding the 2004 crash would not have demonstrated that Dugan caused the instant crash. The instant crash and the 2004 crash were more than a decade apart and completely different types of crashes. The record reveals that the 2004 crash occurred when Dugan was traveling at a high rate of speed and hit another vehicle. *See* Tr. Vol. VII pp. 15-16. Here, there is no indication that Dugan was traveling over the speed limit when the crash with Kaszuba occurred. Rather, the evidence established that the speed limit was forty-five miles per hour, and Dugan was traveling at approximately thirty to thirty-five miles per hour at the time of the crash. Although Defendants argued that Dugan accelerated aggressively when leaving

the gas station, we conclude that there is no similarity in the essential conditions surrounding the two crashes. Accordingly, we cannot say that Defendants' substantial rights were impacted by the exclusion of evidence regarding the 2004 crash. Even if the trial court had admitted evidence of the 2004 crash as impeachment, the evidence would not have had a probable impact upon the jury.

## B. Police Officer's Testimony

[49] Next, Defendants argue that the trial court abused its discretion by permitting Officer Heustis to testify regarding opinion testimony. During preliminary questioning, the trial court found that Officer Heustis was "qualified under [Evidence Rule] 701 to give the jury testimony based on his perception of what he saw at the scene and [ ] as a supervisor of the unit . . . ." Tr. Vol. VI p. 131. The trial court also allowed a "continuing objection under Rule 104 to any of his opinion based testimony." *Id.* at 132.

[50] Defendants argue that the trial court "allowed Heustis to opine on the appropriateness of Kaszuba and Dugan's actions leading to the collision, explain whether he would issue traffic citations to a hypothetical motorcyclist making the same maneuvers as Dugan, and offer unsupported analyses of vehicle speeds and Kaszuba's view from his truck." Defendants' Appellants' Br. p. 50. Defendants complain that Officer Heustis testified in response to hypothetical questions, which are not allowed by Evidence Rule 701, and that

Officer Heustis testified Kaszuba's turn was illegal because he crossed two double yellow lines.[5]

[51] Officer Heustis testified as a skilled witness under Indiana Evidence Rule 701, which provides: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue."

> "The Indiana Rules of Evidence contain two rules for opinion testimony—lay witness opinions under Rule 701 and expert witness opinions under Rule 702." "A 'skilled witness' is a person with a degree of knowledge short of that sufficient to be declared an expert under Ind. Evid. Rule 702, but somewhat beyond that possessed by the ordinary jurors." Evidence Rule 701 "encompasses both ordinary lay witness opinions and skilled witness opinions. The difference between skilled witnesses and ordinary lay witnesses is their degree of knowledge concerning the subject of their testimony." The testimony of a skilled witness "is not a matter of 'scientific principles' governed by Indiana Evidence Rule 702(b); rather, it is a matter of the observations of persons with specialized knowledge." Skilled witnesses may be permitted to testify both about their observations and their "opinions or inferences that are based solely on facts within their own personal knowledge."

*Bush v. State*, 243 N.E.3d 405, 414-15 (Ind. Ct. App. 2024) (internal citations omitted), *trans. denied*. In general, "[a] skilled witness offering an opinion under

---

[5] Officer Heustis testified that it was "not proper to drive in between" the double yellow lines. Tr. Vol. XI p. 142. He also, however, testified that a left turn was not prohibited at that location. *Id.* at 172.

Rule 701 may not base the opinion on information received from others or on a hypothetical question." *Averitt Exp., Inc. v. State ex rel. Ind. Dep't of Transp.*, 18 N.E.3d 608, 613 (Ind. Ct. App. 2014).

[52] We agree that Officer Heustis' testimony went beyond that allowed by a skilled witness because he was allowed to answer hypothetical questions and to testify as to opinions based on information received from others. Without any explanation, Defendants argue that the prejudice from Officer Heustis' testimony was "manifest" and "impossible to overcome." Defendants' Appellants' Br. p. 51. Defendants offer no specific explanation of how Officer Heustis' testimony impacted their substantial rights.

[53] Accident reconstructionist Kevin Johnson testified as an expert in this matter. Johnson testified that: (1) the collision was avoidable; (2) Kaszuba's turn into the parking lot was "risky"; (3) the visibility analysis showed that Dugan was visible and conspicuous to Kaszuba; (4) Kaszuba could have proceeded to the stop light and taken a left turn to get to the Speedway; (5) Dugan was traveling at thirty to thirty-five miles per hour, and Kaszuba was traveling at six to twelve miles per hour; (6) the collision "occurred because of a failure to observe and failure to yield type of situation"; and (7) Kaszuba failed to use reasonable care to maintain a proper lookout and failed to use "the care an ordinarily careful person would use." Tr. Vol. VII pp. 109, 225, 232. The complete trial record— including Johnson's expert reconstruction, the surveillance video showing the collision, physical evidence at the scene, eyewitness testimony, and the parties' own testimony—provided ample properly admitted evidence to support the Court

jury's liability findings. Accordingly, even if the trial court abused its discretion when admitting Officer Heustis' testimony, any error was harmless given the sufficiency of the remaining properly admitted evidence that supported the jury's verdict.

### III. Attorney misconduct during the liability phase

Defendants next argue that this Court should grant a new trial to "remedy [Attorney Rowley's] blatant misconduct during the liability phase." Defendants' Appellants' Br. p. 51. Defendants' argument focuses on: (1) Attorney Rowley's conversation with Kaszuba shortly before Kaszuba's testimony; and (2) Attorney Rowley's statements during his closing argument of the liability phase.

Defendants requested a mistrial in part due to Attorney Rowley's conversation with Kaszuba and Attorney Rowley's comments during closing argument. "A mistrial is an 'extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error.'" *Piatek v. Beale*, 994 N.E.2d 1140, 1145 (Ind. Ct. App. 2013) (quoting *Suding v. State*, 945 N.E.2d 731, 737 (Ind. Ct. App. 2011), *trans. denied*), *aff'd on reh'g*, 999 N.E.2d 68 (Ind. Ct. App. 2013), *trans. denied*. "When determining whether a mistrial is warranted, we consider whether the defendant was placed in a position of grave peril to which he should not have been subjected." *Id.* "The gravity of the peril is determined by the probable persuasive effect on the jury's decision." *Id.*

## A. Conversation with Kaszuba

Immediately before Kaszuba's testimony during the liability phase, Attorney Rowley had a conversation with Kaszuba during a restroom break. Attorney Rowley apologized for Kaszuba being required to testify and blamed Elon Musk for the decision to proceed with the trial. Before Kaszuba began testifying, Defendants objected to Attorney Rowley's comments and asked that the trial court instruct Attorney Rowley not to speak with Kaszuba. The trial court granted the request, and Attorney Rowley agreed not to speak with Kaszuba again. The jury was unaware of this interaction or the dispute regarding the interaction. Defendants later requested a mistrial based, in part, upon this interaction, and the trial court denied the motion.

Indiana Professional Conduct Rule 4.2 provides: "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law or a court order." Here, Attorney Rowley communicated with Kaszuba, whom he knew to be represented by another lawyer, about the instant litigation immediately before Kaszuba's testimony.

Defendants contend that the conversation "rattl[ed] and intimidate[ed]" Kaszuba and that Kaszuba "broke down in tears during his testimony." Defendants' Appellants' Br. p. 51. Norris, however, is correct that there is no evidence in the record that this conversation influenced Kaszuba's testimony or that he broke down in tears during his testimony due to this communication (or

even that he broke down in tears). We in no way condone Attorney Rowley's conduct here, but any prejudice to Defendants from the conversation is speculative at best. Defendants have not demonstrated that they were placed in a position of grave peril or that the conversation had any impact on the jury's determination.

## B. Closing Arguments

[59] Regarding Attorney Rowley's conduct during closing arguments in the liability phase, the entirety of Defendants' argument follows:

> [C]ounsel repeatedly violated the court's orders in his closing argument. *Compare, e.g.*, Appellants' App. Vol. 7, p. 142-44 (prohibiting "expressing any opinion regarding the character of the parties' counsel") *with* Tr. Vol. 9, p. 24 ("They're very skilled lawyers putting that into your head. . . Because people – people in this world – and it's sad – they can be manipulated."), Tr. Vol. 9, p. 30 (similar); Appellants' App. Vol. 7, p. 141 (prohibiting "send a message" arguments) *with* Tr. Vol. 9, p. 100-01 ("[I]t's a finding. And it's to tell Mr. Kaszuba and it is to tell its employer, his employer, Tesla . . . this is unacceptable in Indiana.").

> He made gratuitous reference to Tesla, s*ee, e.g.,* Tr. Vol. 9, p. 21, 30, 31, 49—even though it committed no independent wrongdoing—in his plan to focus the jury on "the richest defendant in the world," Appellants' App. Vol. 9, p. 19-22. And he encouraged the jury to use its verdict to punish and send a message to Tesla, in violation of the court's orders and the law. Tr. Vol. 9, p.100-01; Appellants' App. Vol. 7, p. 141 . . . .

Defendants' Appellants' Br. pp. 51-52.

[60] Defendants did not object to most of the closing argument statements that they now claim were improper. Accordingly, those arguments are waived. *See, e.g.*, *Husainy v. Granite Mgmt., LLC*, 132 N.E.3d 486, 495 n.4 (Ind. Ct. App. 2019) (holding that appellees waived any claim of error regarding "several inflammatory comments in [counsel's] closing argument regarding unfounded accusations that had nothing to do with the matter at hand, including the ownership of Granite and the pay rates of Granite employees, among others" where appellees failed to object to the comments).

[61] Defendants did object to Attorney Rowley's "send a message" statements. Tr. Vol. IX p. 101. As a result, the trial court gave a curative instruction and said, "Ladies and gentlemen, I'm going to have you disregard the comments counsel made that might be construed as asking you to send a message to the Defendants. You know, you're going to be basing your verdict on the facts that you find, based on the evidence that was presented and my instructions on the law." *Id.* at 102-03.

[62] "'Generally, a timely and accurate admonition is an adequate curative measure for any prejudice that results.'" *Perry v. State*, 78 N.E.3d 1, 12 (Ind. Ct. App. 2017) (quoting *Orta v. State*, 940 N.E.2d 370, 374 (Ind. Ct. App. 2011), *trans. denied*). "'When the jury is properly instructed, we will presume they followed such instructions.'" *Id.* (quoting *Duncanson v. State*, 509 N.E.2d 182, 186 (Ind. 1987)). "'We seldom find reversible error when the trial court admonishes the jury to disregard the statement made during the proceedings.'" *Id.* (quoting *Davidson v. State*, 580 N.E.2d 238, 241 (Ind. 1991)). Given the trial court's

admonition and curative instruction, we find no reversible error as a result of Attorney Rowley's statement.

## IV. *Ex Parte* Communications

[63] Defendants argue that the trial court erred by having *ex parte* communications with the jury during the damages phase deliberations. In general, when a trial court is informed that the jury has reached an impasse, Indiana Jury Rule 28 governs and provides:

> If the jury advises the court that it has reached an impasse in its deliberations, the court may, but only in the presence of counsel, and, in a criminal case the parties, inquire of the jurors to determine whether and how the court and counsel can assist them in their deliberative process. After receiving the jurors' response, if any, the court, after consultation with counsel, may direct that further proceedings occur as appropriate.

Jury Rule 28 "urges that trial judges facilitate and assist jurors in the deliberative process, in order to avoid mistrials." *Tincher v. Davidson*, 762 N.E.2d 1221, 1224 (Ind. 2002). Our Supreme Court has encouraged "trial courts to employ other and creative approaches to assist and enable juries to resolve difficulties." *Id.* at 1223.

[64] An *ex parte* communication between the trial court and the jury, however, "creates a presumption of error." *Minor v. State*, 252 N.E.3d 979, 985 (Ind. Ct. App. 2025) (quoting *Bouye v. State*, 699 N.E.2d 620, 628 (Ind. 1998)), *trans. denied*. "[S]uch presumption is rebuttable and does not constitute per se grounds for reversal." *Id.* "'In deciding whether the presumption of harm has

been rebutted, we evaluate the nature of the communication to the jury and the effect it might have had upon a fair determination.'" *Id.* at 988 (quoting *Henri v. Curto*, 908 N.E.2d 196, 201 (Ind. 2009)).

[65] It is undisputed that the trial court had a conversation with the jury in the jury room without the parties' counsel present. Accordingly, there is a presumption of error. The issue here is whether that presumption was rebutted. Our Supreme Court addressed a similar issue in *Smith v. Convenience Store Distributing Co.*, 583 N.E.2d 735, 738 (Ind. 1992). There, during a personal injury jury trial, deliberations began at 3:30 p.m., and the jury informed the trial court that it was deadlocked at 9:15 p.m. "After a discussion with the court, counsel for both sides agreed to allow the judge to go to the jury room to determine (1) whether the jury wanted to retire for the evening and return the next morning to continue deliberations, and (2) the numerical split among the jurors, without reference to in whose favor the jury was split." *Smith*, 583 N.E.2d at 737. The judge entered the jury room to discuss these issues. During the judge's discussion with the jury, "one of the jurors asked the judge what would happen if the jury remained deadlocked. The judge indicated that 'the parties had attempted to mediate this case, but that their efforts had proved to be unsuccessful.'" *Id.* "The judge also indicated that 'he did not believe the case would be settled, and if the jury was hung, the case would probably have to be retried.'" *Id.* Approximately ten minutes later, the jury returned a verdict for Convenience Store.

On appeal, our Supreme Court warned that, generally, "*ex parte* communications between a judge and the jury are prohibited." *Id.* When the judge went to the jury room, the judge was limited to obtaining the "two specific pieces of information." *Id.* Instead, the judge answered the juror's question outside the presence of the parties. Accordingly, our Supreme Court presumed that prejudice occurred.

In determining whether the presumption of prejudice was rebutted, the Court first noted that jury deliberations are "a sensitive point in the trial" and that such deliberations "are to be free of extraneous influence so this purpose can be fulfilled." *Id.*

> Convenience Store argues, and the Court of Appeals agreed, that the judge's comments relating to mediation and retrial were merely a statement of the obvious. Given that the question was posed by the juror in the first place, we do not accept that the effect of a failure to render a verdict was so apparent to the jury. Additionally, the information provided by the judge was not necessarily accurate because the parties may well have negotiated a settlement rather than incur the costs associated with a second trial. Finally, it is reasonably possible that advice from the judge that another jury will have to hear the same evidence in a new trial may have induced the jury members to prove themselves capable of resolving the controversy rather than forfeiting the opportunity to another group.

*Id.* at 738. Further, a verdict was reached by the jury only ten minutes after the judge's comments. "This sudden turn of events suggests that the judge's comments may have had an influence on the verdict." *Id.* Our Supreme Court, thus, concluded that the presumption of harm had not been rebutted. In doing

so, the Court noted that "this case aptly illustrates the perils inherent in any *ex parte* contact with the jury during deliberations, even those which occur with the agreement of the parties. We believe that in all circumstances the preferred method for communicating with the jury is on the record in open court." *Id.*

[68] Similarly, here, the presiding juror informed the trial court that the jury was at an impasse. The trial court then told the parties that it was declaring a mistrial on the damages phase and that it would allow the parties thirty days to submit briefs as to whether a mistrial on the liability phase was also required. The trial court informed the parties that it was going to go to the jury room "and tell the jury what's happened and . . . see if the presiding juror might talk" to the attorneys to assist in retrying the matter. Tr. Vol. XII p. 70. Upon returning, the trial court stated:

> So when I went back in there, the jury indicated that they had changed their mind. That they are, and Mr. Juror Number One, is willing to work with them. They would like to have the opportunity to continue to deliberate. I said I would have to bring them in here and have them on the record, each of them, affirm that they do want to continue to deliberate, that they are not being coerced, they're not being pressured, and that they do want to continue to work on this case. So that's what I told them.

*Id.* at 70-71. Defendants objected that the trial court had already granted the mistrial, and the trial court stated, "Well, I can un-grant it. It's un-granted." *Id.* at 71. The trial court stated, "[L]et's find out what the jury says. They were

very upset to hear that they couldn't continue. So, go ahead. I think they have a lot of investment in this case as well." *Id.*

[69] The trial court then brought the jury into the courtroom and asked the jury:

> [Y]ou indicated to me back in the jury room when I went back there to see you just a couple of minutes ago that you do want to continue to deliberate, that you do believe that you have resolved the differences that you've had among yourselves, that you think you can make some progress. Is that correct[?]

*Id.* Each juror responded that they wanted to continue deliberating, that they were not being coerced, and that they were all "freely and in good will and good faith wanting" to continue deliberating. *Id.* at 72. The trial court then sent the jury back to the jury room to continue deliberating over Defendants' objection.

[70] Defendants argue that the verdict was reached thirty minutes later, but the record does not indicate the exact timing between the *ex parte* conversation and the verdict. The record indicates that the jury began deliberations at 11:37 a.m.; at approximately 6:00 p.m.; Juror No. 1 began expressing that he was not going to change his mind and impasse discussions began; and the jury reached its verdict at 7:47 p.m. Regardless, it is clear that the verdict was reached soon after the trial court's conversation with the jurors.

[71] As in *Smith*, although the parties agreed that the trial court could enter the jury room to inform the jurors of the mistrial and ask the presiding juror if he or she wanted to discuss the case with the attorneys, the judge went beyond this

agreement. Even though we do not have an exact record of the judge's conversation with the jurors, it is apparent from the judge's later statements that, upon learning of the mistrial, the jurors stated that they had resolved their differences and wanted to continue deliberating. The trial court apparently told the jurors: "I said I would have to bring them in here and have them on the record, each of them, affirm that they do want to continue to deliberate, that they are not being coerced, they're not being pressured, and that they do want to continue to work on this case." Tr. Vol. XII p. 70. Once the judge learned the jurors were no longer at an impasse, the judge needed to leave the jury room and bring the jurors before the parties.

The trial court then brought the jurors into the courtroom and polled the jurors. We cannot, however, conclude that the polling of the jurors rebutted the presumption of error. This is so because, when the jurors were polled, each of them gave the "correct" answer to the questions the judge had previewed for them. Although the judge may not have wanted to influence the jurors to continue to deliberate, we cannot rule out that the *ex parte* discussion with the judge encouraged at least the recalcitrant juror to give up his opinion.

Also, although the jurors had been at an impasse only minutes before, the jurors quickly reached a verdict after the conversation with the judge and the polling. The quick verdict suggests that the judge's *ex parte* conversation with the jurors may have had an influence on the verdict. As in *Smith*, "this case aptly illustrates the perils inherent in any *ex parte* contact with the jury during

deliberations." *Smith*, 583 N.E.2d at 738. Accordingly, we are compelled to find that the presumption of error was not rebutted.

[74] Because we conclude that Norris did not rebut the presumption of error created by the trial court's *ex parte* conversation with the jurors, we need not address Defendants' argument that the trial court's communication with the jurors amounted to an *Allen* charge[6] and that the trial court could not "un-grant" the mistrial. We are left, however, with the question of whether to reverse only the damages phase of the trial or both the liability and damages phases.

[75] At oral argument, Defendants argued that the parties specifically agreed that the liability and damages phases would be heard by the same jurors. Indiana Appellate Rule 66, however, provides that this Court may "with respect to some or all of the parties or issues, in whole or in part: . . . (3) order a new trial or hearing; . . . (9) make any relief granted subject to conditions; and (10) grant any other appropriate relief." The Rule specifically provides: "If a new trial is necessary, it shall be limited to those parties and issues affected by the error unless this would be impracticable or unfair." Ind. App. R. 66(D); *see also* Ind. Trial Rule 59 ("[I]f a new trial is required it shall be limited only to those parties and issues affected by the error unless such relief is shown to be impracticable or unfair."). It would not be impracticable or unfair for different jurors to hear the damages phase of this trial. *See, e.g.*, *Ramada Hotel Operating Co. v. Shaffer*,

---

[6] *See Allen v. United States*, 164 U.S. 492 (1896).

576 N.E.2d 1264, 1271-72 (Ind. Ct. App. 1991) (reversing for a new trial on the issue of punitive damages only), *decision clarified on reh'g*, 580 N.E.2d 306 (Ind. Ct. App. 1991). In fact, it would be a waste of judicial resources to require a new trial on both phases.[7] "Our courts promise litigants a fair trial, not necessarily a perfect one." *Abbas v. Neter-Nu*, 261 N.E.3d 233, 252 (Ind. 2025). Defendants here received a fair trial during the liability phase. Accordingly, we reverse the damages phase of this trial only and remand for a new trial on damages.

## Conclusion

[76] The trial court properly granted summary judgment to Norris and Kaszuba regarding whether Kaszuba was acting within the scope of his employment at the time of the crash, and Defendants have failed to demonstrate reversible error regarding the liability phase of the trial. With respect to the damages phase, however, Norris has failed to rebut the presumption of error resulting from the trial court's *ex parte* conversation with the jurors. Accordingly, we affirm in part, reverse in part, and remand for a new trial on damages only.

[77] Affirmed in part, reversed in part, and remanded.

May, J., and Vaidik, J., concur.

---

[7] Because we are remanding for a new damages phase of the trial, we need not address Defendants' argument that the damages award was excessive.

ATTORNEYS FOR APPELLANT – TESLA, INC.

Daniel E. Pulliam
Brian J. Paul
Andrea Roberts Pierson
Faegre Drinker Biddle & Reath LLP
Indianapolis, Indiana

Ellyde R. Thompson
Chelsea Sincox
Quinn Emanuel Urquhart & Sullivan, LLP
New York, New York

Matthew Alex Bergjans
Quinn Emanuel Urquhart & Sullivan, LLP
Los Angeles, California

ATTORNEYS FOR APPELLANT – KYLE KASZUBA

Lisa A. Baron
Clark Johnson & Knight, Ltd.
Carmel, Indiana

Paul B. Johnson
Elizabeth M. Wheaton
Clark Johnson & Knight, Ltd.
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Steven David
Alexander P. Pinegar
Rachel Dever
Kevin Smith
Church Church Hittle + Antrim
Noblesville, Indiana

Lee C. Christie
Katherine M. Marshall
Christie Farrell Lee & Bell P.C.
Indianapolis, Indiana